STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-06-53

PETER YERXA, et al.,

Plaintiffs,

v.

ORDER

DONALD L. GARBRECHT
LAW LIBRARY

AUG 2 0 2007

TOWN OF SCARBOROUGH, et al.,

Defendants.

A bench trial in the above-captioned case was held on March 12, 2007, and the parties have thereafter submitted extensive post-trial briefs.

The court finds as follows:

1.     John Gamage developed the Springbrook Subdivision in Scarborough, Maine beginning in 1987.

2.     The Springbrook Subdivision contained 55 numbered lots, but only 54 were numbered as building lots.   Lot 55, which ultimately became known as Springbrook Commons, is variously described in the record as consisting of either 8.87 or 8.88 acres designated as "dedicated open space."  Springbrook Commons was never intended to be a building site.

3.     As part of the development of the Subdivision, the Town of Scarborough required Gamage to dedicate certain common space for public use.  On October 11, 1988, the Scarborough Planning Board approved the subdivision, conditioned, *inter alia,* on the dedication of a recreational area (Lot 55) to be worked out by the administration of the Town of Scarborough and Gamage.  Exhibit 15.

4.     In 1989 the Town voted to accept the 8.88 parcel shown as dedicated open space from Gamage.  Exhibit 17.

5. In April 1991, Gamage deeded Lot 55 in the subdivision to the Town.

6. The April 1991 deed to the Town contained certain restrictions, including that Lot 55 "shall be used by [the Town] and the general public for recreational purposes only." Exhibit 18. The deed did not state that it conveyed any rights to anyone other than Gamage or the Town to enforce its restrictions. None of the owners of the lots in the Springbrook subdivision are named in the warranty deed, and there is nothing in the deed that extinguished Gamage's rights to clarify or release any of the restrictions contained in the deed.

7. Lot 55 was subsequently developed as a park with actively used baseball and soccer fields and a permanent "snack shack." Anyone renting the snack shack must pay to the Town 30% of the proceeds of any snack sales, which the Town uses for maintenance of the snack shack. Any nonresident group must pay the Town a fee for using the fields at Springbrook Commons.

8. In April 1991, Gamage created a Declaration of Covenants, Restrictions and Conditions for the Springbrook Subdivision. Exhibit 24. The Declaration was amended on two subsequent occasions.

9. Article II of the Declaration contains certain use and occupancy restrictions which are by their terms applicable to "each lot conveyed in Springbrook." Article I, Section 3, defines "Lot" to mean "numbered building sites" shown on the recorded subdivision map. While Springbrook Commons was identified by a number (Lot 55), it was always designated as "open space." As noted above, it was never designated as or intended to be a "building site."

10. At some point in or around August 1996, plaintiffs Peter and Carol Yerxa became interested in purchasing Lot 4 in the Springbrook Subdivision. The Yerxas represented themselves without the assistance of a broker. The Yerxas dealt with John

2

Gamage. Lot 4 was in fact owned by John Gamage's son, William Gamage. In this transaction, John Gamage was serving as his son's real estate broker – a fact confirmed in the eventual purchase and sale agreement. Exhibit 2 ¶ 9.

11. The Yerxas never met William Gamage. Before purchasing Lot 4, plaintiffs had one conversation with John Gamage regarding the subdivision. During that conversation, Peter Yerxa asked John Gamage what Lot 55 was to be used for. At the time, Lot 55 was still undeveloped. Gamage told Yerxa that it would contain "ball fields." Yerxa also asked Gamage whether the park would contain lights permitting evening or nighttime activities. Gamage said it would not contain such lights. Gamage made no other verbal statements to the plaintiffs regarding Springbrook Commons.

12. Prior to the Yerxas' purchase of Lot 4, John Gamage gave them a pamphlet that contained the Declaration of Covenants, a DEP site location order, the bylaws of a homeowners' association for the subdivision, and a copy of Gamage's April 1991 deed of Lot 55 to the Town.

13. Gamage made no oral representations to the Yerxas regarding the restrictions in the April 1991 deed. Specifically, Gamage never told the Yerxas that they had any right to enforce the restrictions contained in his April 1991 deed to the Town, nor did he tell them that the restrictions would continue indefinitely. Gamage also never told the Yerxas that he would never clarify or change any of the restrictions.

14. The warranty deed, and particularly the "for recreational use only" language in the warranty deed, did not constitute a representation to the Yerxas. It was provided to them for their information but without any promise or representation that they had the right to enforce the deed restrictions or that those deed restrictions were not subject to modification in the future.

3

15. At the time the Yerxas purchased Lot 4, no one had proposed placing a cellular tower or flagpole antenna on Lot 55. Gamage had not been asked to modify any of the deed restrictions and had not formed any intention of clarifying or modifying any of the deed restrictions.

16. On September 9, 1996, plaintiffs entered into a purchase and sale agreement with William Gamage to acquire Lot 4. Exhibit 2. That agreement contained an integration clause, stating that "[a]ny representations, statements and agreements are not valid unless contained herein. This agreement completely expresses the obligations of the parties."

17. On September 30, 1996, John Gamage entered into an agreement with the Yerxas concerning a possible extension of Springbrook Lane to some additional property Gamage was considering purchasing. Exhibit 4. This contract does not relate in any way to Springbrook Commons, and the Yerxas do not contend that Gamage breached this contract.

18. In 2005, nine years after the Yerxas had purchased Lot 4, US Cellular approached the Town about installing a cell tower in the western part of the Town. The Town and US Cellular identified Springbrook Commons as an appropriate location for a tower because public safety communications and cell phone reception were problematic in that area. In particular, once public safety officials leave their vehicles in that area, they are unable to communicate with dispatch or the hospital by using their mobile radios. The presence of a communications tower would permit public safety personnel who were on the ball fields in Springbrook Commons to communicate with dispatch and the hospital using their mobile radios. The presence of a communications tower would also permit US Cellular customers to make cellular phone calls from Springbrook Common and the surrounding area.

4

19. US Cellular proposed building and installing a tower at its expense, installing the Town's public safety communications equipment on the tower and then giving the tower to the Town. US Cellular would then rent space on the tower from the Town. The Town approved the arrangement with US Cellular with the stipulation that a flagpole design would be used, with all of the communications equipment concealed inside the flagpole.

20 The proposed structure would look like a very tall, metallic flagpole and would fly an American flag. As currently proposed, the structure would be 90 feet tall and thicker than an ordinary flag pole – approximately 30 inches in diameter at the base tapering to 18 inches at the top. Springbrook Common is properly zoned for the flagpole antenna because it is a "municipal use" and Springbrook Common is municipal property. Under the Town's zoning ordinances, leasing space inside the flag pole to US Cellular is a "special exception," which was ultimately approved by the Zoning Board of Appeals after proper notice and public hearing.

21. Two similar flagpole antennas already exist in the Town. A picture of one of those is contained in the record. Exhibit 6. The picture in Exhibit 6 demonstrates that while the structure might be described as a rather tall, thick metallic flagpole, it does not appear to be a communications or cell phone tower. Exhibit 6, which is a brochure circulated by the Town's Public Safety Department urging the support of the structure, also demonstrates that the Town of Scarborough was not merely accepting the flagpole antenna as an accommodation to US Cellular, but affirmatively wanted such a structure for its emergency communications.

22. In the summer of 2005, a representative from US Cellular contacted John Gamage and provided him with information about the plan to install a flagpole antenna in Springbrook Common. At some point Gamage was sent a release deed for his

signature. Exhibit 9. The release deed stated that it was intended to clarify the first restriction in the April 1991 deed. It granted to the Town the "right to lease [Springbrook Commons] for the specific use of a telecommunications facility in the form of a flagpole, with no lighting, but with equipment cabinets and utility connections to serve that facility, including the right of ingress and egress for serving that facility."

23. On September 6, 2005, Gamage, who was unaware that there was any opposition to the proposed flagpole antenna,[1] signed the release deed. Gamage received no compensation for signing the release deed.

24. At the end of September 2005, Peter Yerxa contacted Gamage for the first time regarding the project. He asked Gamage if he would rescind the release deed. Gamage told him he had signed the release deed and would not rescind it at that point. He recommended that Yerxa deal with the Town. Gamage thereafter sent Yerxa a letter on October 19, 2005, stating that he shared certain of Yerxa's concerns with respect to the visual impact of the structure. Exhibit 10. That letter did not suggest, however, that Gamage intended to take any action to rescind or modify the release deed.

25. Under the current site plan, the flagpole antenna will be installed approximately four to six hundred feet from the Yerxas' property. It will be screened by trees and shrubbery. Photographs taken from the tower location towards the Yerxas' home indicate that the Yerxas' home is not visible from the proposed location. The record does not reflect whether the Yerxas will be able to see the top of the flagpole antenna from their home. In any event, the flagpole antenna will not be an obtrusive feature in the Yerxas' view.

---

[1] There is no evidence in the record as to opposition from anyone other than the Yerxas.

26. The court does not find credible Peter Yerxa's estimate with respect to the loss of property value that he anticipates if the flagpole antenna is built. There is no credible evidence that the Yerxas will suffer any monetary damage from the construction of the flagpole antenna.

Discussion

1. Conditional Gift

The Yerxas place primary reliance on the claim that Gamage's April 1991 deed of Springbrook Commons to the Town was a conditional gift, and they cite 30-A M.R.S. § 5654(2), for the proposition that once the donor has completed the donor's part of the agreement, the municipality "shall perpetually comply with the conditions upon which the agreement was made."

There are two problems with this argument. The first is that the Yerxas have offered no authority, and the court is aware of none, that the Yerxas, as strangers to the April 1991 deed conveying Springbrook Commons to the Town, have standing to enforce any conditions set forth in the deed. The rule, as the court understands it, is that only the parties to a contract have standing to enforce the contract.

Second, even if under some circumstances the Yerxas might have standing to enforce the provisions of a conditional gift even though they were not the donors, the conditions they are seeking to enforce cannot survive Gamage's waiver of those conditions in the release deed. To the extent that 30-A M.R.S.A. § 5654(2) is designed to require future compliance, it is intended to protect the intent of the donor. Section 5654(2) does not prohibit a donor from changing the conditions of his gift and it does not affect the donor's ability to modify the transaction in any way. Accordingly, where Gamage, as the donor, has now specifically authorized the flagpole antenna, the Yerxas

7

are not entitled to roll back the clock and require perpetual compliance with previous conditions that the donor has released.

## 2.    Declaration of Covenants

The Yerxas' second major argument is that apart from any conditions in the April 1991 deed, Springbrook Commons is subject to paragraph 12 in Article II of the Declaration of Covenants (Exhibit 24), which states that

> The premises shall be used only for residential purposes and, without limitation, no commercial, industrial or business use or enterprise of any nature or description shall be carried out on the premises.

As noted in the findings above, this contention fails to take into account that paragraph 12 of Article II is applicable only to "lots" as defined. Thus, Article II begins

> Each lot conveyed in Springbrook shall be subject to the following covenants and restrictions which shall run with the land:

Twenty-seven numbered paragraphs follow, including paragraph 12 upon which the Yerxas place reliance.

"Lot," however, is a defined term in Article I Section 3 of the Declaration of Covenants:

> "Lot" shall mean and refer to those numbered building sites shown upon the recorded subdivision map of the property.

Springbrook Commons, although shown as Lot 55, was never designated as or intended to be a "building" site. It was always to be designated open space. Paragraph 12 of Article II therefore does not apply to Springbrook Commons. This is true even if Gamage's April 1991 deed to the Town (Exhibit 18), which is not expressly made subject to the Declaration of Covenants, were found to be subject to the Declaration by implication.

8

The inapplicability of Paragraph 12 to Springbrook Commons is apparent from the express terms of that paragraph, which states that the premises shall be used "only for residential purposes." Springbrook Commons is not now, has never been, and was never intended to be used for <u>residential</u> purposes. It is being used for recreational purposes and as common open space for the adjoining residential lots.

3.     <u>Alleged Misrepresentations by Gamage</u>

The Yerxas also argue that Gamage's actions at the time of their purchase of Lot 4 constituted a representation that the conditions contained in his original April 1991 deed to the Town would remain in effect. The findings of fact set forth above do not support this claim.

Directing the Yerxas' attention to the April 1991 deed provided them with relevant information as to the development, but did not give them legal rights as strangers to enforce the deed restrictions. The Declaration of Covenants and the April 1991 deed were both provided to the Yerxas. Pursuant to the express terms of the Declaration, they had certain enforceable rights with respect thereto.[2] The April 1991 deed gave them no comparable enforceable rights, and Gamage said nothing to change that. Specifically, Gamage made no representation to the Yerxas that Springbrook Commons would always be used solely for recreational purposes and he made no representation that he would not or could not modify the conditions set forth in the April 1991 deed.

Even if he had made such representations, representations as to future actions are only actionable if false when made. Restatement 2d Torts § 530(1). It is undisputed

---

[2] As noted above, however, the Declaration did not subject Springbrook Commons to paragraph 12 of Article II.

that in 1996, when the Yerxas purchased their lot, Gamage had no intention of modifying any deed conditions. Nobody had any inkling at that time that there would ever be a proposal to erect a flagpole antenna on Springbrook Commons.

4.      Alleged Breach of Contract

The foregoing discussion also disposes of the Yerxas' claim for breach of contract against Gamage. Several additional points should be made as to this claim. First, the purchase and sale agreement was between the Yerxas and William Gamage, not between the Yerxas and John Gamage. To the extent the Yerxas believed that John Gamage owned Lot 4, that misunderstanding could not survive the express language in the purchase and sale agreement that John Gamage was acting as a real estate broker.

Second, the purchase and sales agreement expressly provided (Exhibit 23 ¶ 12) that "any representations, statements, and agreements are not valid unless contained herein. This agreement completely expresses the obligations of the parties." This language is a further bar to the Yerxas' misrepresentation and breach of contract claim against John Gamage.

5.      Damages

Defendants have suggested with some force that Peter Yerxa's testimony as to the anticipated loss of value of his property resulting from the flagpole antenna is inadmissible under Morin Building Products Co. v. Atlantic Design and Construction Co., 615 A.2d 239, 241 (Me. 1992). Even if Peter Yerxa's testimony is admissible, however, the court is not obligated to credit that testimony and finds as set forth above that his estimate was nothing more than unwarranted speculation. The court reaches this conclusion based on Yerxa's deposition testimony on the same subject and also

10

based on the photographic and other evidence demonstrating that, no matter how sincerely Yerxa objects to the flagpole antenna, it would not impinge upon his property in any significant respect.

The entry shall be:

Judgment shall be entered for defendants dismissing plaintiffs' complaint with costs.

DATED:    May _21_, 2007

_____
Thomas D. Warren
Justice, Superior Court

11

GLENN ISRAEL ESQ
PO BOX 9729
PORTLAND ME 04104

*Town of Scarborough*

WILLIAM KANY ESQ
PO BOX 1179
SACO ME 04072

*Plaintiffs'*

BRENDAN RIELLY ESQ
PO BOX 4510
PORTLAND ME 04112

*Gamage*